The last case on for argument today is Zaratzian v. Abadir and Carlin. Here, let me give you these. I don't think those are useful. Mr. Burke, good morning. Good morning, Your Honor. May it please the Court, my name is Harold Burke. I represent Dr. Annabelle Zaratzian. I'd like to reserve three minutes for rebuttal. Essentially, the facts in this case, as presented to the jury, revealed that for a period of some two and a half years after Dr. Zaratzian and the defendant, Dr. Abadir, were divorced, there was an ongoing interception of her electronic communications, namely interception of her email, incoming into her account. This continued, as we outlined in the briefs, through the activation of an auto-forwarding rule on her email account that occurred during the marriage. The only evidence of consent that was presented to the jury was a very, very brief conversation that occurred during the marriage in 2004 in which Dr. Abadir, frustrated with his claim that he wasn't getting sports messaging, said to his wife, I'm going to forward your email. And that was it. That was the only evidence before the jury. That's back at the time that he had control or they had joint control of the account? That's correct, Your Honor. And thereafter, at some point, she assumed complete control of the account? That's correct. After the parties separated. And the issue of whether there was consent, of course, was argued to the jury and the jury presumably made its determination. Frankly, we don't know what the jury did because the interrogatory— The jury reached a resolution. That's correct. And please continue. There were three claims that were presented in the jury interrogatory. The instruction was thorough, but the interrogatory presented to the jury asked whether or not there had been an unlawful—had she proven that there had been an unlawful interception of electronic communications. The burden of proof to prove consent always rested with the defendant. Did you ask for an interrogatory that specifically required the jury to answer the question in terms of the defendant's burden of proof on that? I did, Your Honor. In fact, I did it in two manners. The first was a flowchart, which is attached as Exhibit S-1 to the defendant's brief. That's Dr. Abadir's brief. There is a flowchart manner by which I proposed a flowchart because of the complicated issues here. Three tiers of defenses, essentially. The secondly, I, in narrative form, outlined 29 questions of which that was earmarked in there, and that's contained in, I believe, the first volume of the record. We believe that there were two— Did the trial judge not have discretion to decide that this flowchart was way too complicated? He did, Your Honor, and that's why I presented it also in narrative form. I mean, flowcharts are used. The IRS uses it. We felt that it, at the time, was a— Nobody thinks the IRS— True. We thought, given the interplay between the three defenses here, the issue of consent, the issue of statute of limitations, and the issue of intention, that this was perhaps an effective way, when you look at it and actually go through it, of graphically making the decisions that needed to be made. Realizing that someone could construe it as confusing— I mean, is your argument today that it was an abuse of discretion and you're entitled to reversal because the judge declined to use the flowchart? No. No, Your Honor. Our point is that the judge had, I think, a fundamental misunderstanding of the law. He cut this case off, or started this case, as far as claims were concerned, at the time that the parties entered into their marital separation agreement, which was December 19th. He said that the waiver provision, the release and waiver provision in the agreement, in a separation agreement as commonly signed by divorcing parties, cut off any liability prior to that date, so the liability was prospective at that point. What he didn't do was address the issue of what happened to the consent, because now these parties are separate. They're not married. The judge did charge the jury that it had to find deliberate and purposeful conduct, right? That would go to the issue of intent, Your Honor. Right, and the jury apparently did not find intent. Well, the problem with that, though, is that there was no evidence to show that there was a lack of intent. And what I mean by that is that the standard that this Court articulated in U.S. v. Townsend, which you cited in our brief— or that there had been a change. There was testimony on his lack of intent and purpose, I believe. Well, he testified that he—well, number one, he did intend to acquire the e-mails. What he claimed he didn't want— When there was evidence on the lack of intent, was there— I don't believe that there was, Your Honor. I mean, it was his subjective intent to not being able to turn the thing off. Once he had started this operation, he had to go back in and shut it off, or alternatively tell her, hey, this is going on, you need to shut it off. He couldn't turn it off because he had lost control of the account, and I think he explained that. But what he could have done, and he failed to do, was, number one, tell his wife this was going on, or alternatively, turn off, in terms of his receipt— he could have blocked, from a technological standpoint, the e-mails that he was receiving. He could have stopped receiving them. That was within his control. But more critically, what he continued to do was to acquire the messages and then ultimately use them, such as the tax return that was used, provided to his attorney in the post-judgment matrimonial proceedings, as well as other information, such as her information contained in her will. So our submission is that the key error here on the part of the Court was the failure to recognize that the divorce, if not the separation agreement two days earlier, was the game changer. That is when consent was, by operation of law, effectively revoked. His authorization to use that account stopped. It's like someone who is an employee who has the right to access a computer, to use a computer, is now fired. He's now an ex-employee. With that goes the authorization to interact with that computer system that's owned by the employer. And similarly— Well, they still have kids. They still have kids. Kids are going to sports events. Right. There is some notice requirement, or whether it's a phone call or whatever. I mean, it's just—it's not like the employee, to my mind, who has no business being in his former business's computer system or server. It's a dad who, at least ostensibly, at least the facts presented here, needed or wanted and was agreed upon, could have access to his kids' schedules. Clearly, the separation agreement addressed that point, too. This was a separation agreement that provided for week-on, week-off, meaning that the children are exclusively with the father on week one, exclusively with the mother on week two. Each parent is responsible for getting the children where they need to go. But if it's a sports event, presumably, wherever the kid is, the other parent can come watch the sports event, right? Or does that preclude— They have the right to do that. There was a provision in there that joint activities— There need to be communication on that type of a thing. But certainly the situation, because of the separation agreement and the formality by which it was executed, was far different than what occurred during the separation, the pre-divorce period of the parties here. The issue concerning intent is obviously a big one here because it was the burden of the plaintiff to establish that the defendant knew what he was doing. And under the standard in Townsend, he clearly knew what he was doing. He set this up. He was the one person who could have stopped it, and all it would have required was a phone call. Well, no, she could have stopped it. Well, if she knew about it. And the evidence that we— She agreed to it, and she knew the e-mails were going, and she was in charge of the e-mail account. Why couldn't the jury have taken that view? Well, I think the— Were you not getting bounce-back messages for over a year that, in essence, told her what was happening? The bounce-back messages started in June of 2009, after she had a conversation with the Cablevision people, discovered the existence of this other account that was linked to her account. She said, stop, terminate that e-mail. She knew that for a year. She knew for a year that there was another account linked to her account, right? That's correct. And she didn't do anything about it for a year? She did. She filed a lawsuit a year and a half later. Well— We were in the statute. My question was, she didn't do anything about it for over a year. Isn't that true? That is correct. But there were no e-mails that— I don't see that at all in terms of being consent, because the consent has to be— Together with the evidence, whether you accept it or not, but together with the testimony that, in fact, she did consent when it was first put into place. I'm not arguing the issue of whether or not there was consent or not consent back in 2004. That was a jury decision. Yeah, but I'm saying, taking the two together, could the jury not find that at least until she said something, she was implicitly consenting because she knew, or she should have known, from the bounce-backs for over a year that this had been going on? At the time that the bounce-backs occurred, the interception had stopped because the bounce-backs indicated that the messages that were being forwarded to Dr. Abadir's account were not being delivered. So the interception had terminated by that point in time. And it was granted she probably could have looked at the e-mails earlier, but when she did look at them in June of 2010 and appreciated what the problem was after getting somebody from Cablevision on the phone, and there was a recording provided, you can hear that, it's at that point that the investigation started. And it was September of 2010 that the Smutskiewicz came down, Smutskiewicz case came down, and on the same, basically the same fact pattern revealed that this was an interception. Thank you. Thank you. You have reserved 3 minutes for rebuttal, Mr. Burke. Good morning, Your Honors. May it please the Court. My name is Nathaniel Marmer. I represent Dr. Abadir, and I represented him at the trial below. I think the Court is hitting on the right points here, and from a factual matter, there were really two key questions in dispute below. There was the question of consent, and more particularly the scope of consent, and there was the question of intent. And all of the specific facts that I think you were questioning my adversary about were the type of issues that there was tremendous amount of testimony, there was a lot of documentary evidence, including the e-mails. It was essentially two separate stories. There was my client's story, which obviously the jury credited, which was a linear story that talked about the marriage, the good points and the bad points, that talked about the specific reason that this auto forwarding rule was set, that talked about the circumstances around that, that talked about his ability to, as the master control holder of the account, that he didn't specifically need it, that he also set up the account for her with her consent and she gave him the password. But even aside from those two, which alone would have been consent, they specifically had a conversation about it. She denied that, which was her right to deny it, but clearly the jury found that as was a key issue in dispute. What about the issue of consent after the separation? There was plenty of reason. What happened was that the judge made clear that this was an issue of scope of consent at the outset and throughout the course of the marriage. And the jury had plenty of reason to believe, since they credited my client, that she had given consent, she was aware of the auto forwarding rule, that that continued throughout. As Judge Hall mentioned, there was continued relationship between the parties. There was reason there for him to continue to get those notices. She really was not someone who used e-mail very much. 90-whatever percent of the communications were either spam or related to the kid's schedule. So that was one reason the jury could have found that it continued. Another reason the jury found- Was that argued in summation to that she consented to the continued auto forwarding because of the initial consent? Absolutely. And then the knowledge thereof and the scope? Yes. I mean, absolutely. In fact, the issue that he raises now as a matter of law, he didn't raise below. But when there were issues about what could have affected consent as a matter of law, I think it's clear from our brief where we quote what the judge said was, look, I'm going to deal with this. And this was on both sides of the equation. This is a question of scope of consent. You're both entitled to argue scope of consent to the jury. We had several theories, including that she was aware of this throughout and that her husband, her lawyer- Was that appropriate? No. I mean, as a human matter, as an ethical matter, it was certainly not an appropriate thing. And we conceded that. I think my client was very upfront about that, you know, this is not a nice thing to have done. But to begin with, on summary judgment, the judge dismissed what was a constructive fraud claim, which was in essence an argument by the plaintiff that the material that had been gathered, there were a few documents but not many, had somehow affected the marital separation agreement. And the judge found that nothing that was used, nothing that was passed along amounted to anything. And, in fact, there were no claims for damages other than statutory damages or I think it just came down to statutory damages. There was no actual damages that resulted from any of the interceptions. And, of course, what ultimately, as the verdict sheet that we submitted and the judge adopted made clear, was if you found that there was no primary violation, which the jury found, then there could not have been any liability for use or disclosure. So, again, I think my client testified quite credibly on a number of points. And what his basic position was, look, this was a very difficult, acrimonious divorce. There were a lot of emotions flying about. And here was this auto forward rule that had been set at a time of sort of marital harmony. We had discussed it. She said it was a good idea. We're getting divorced. I'm still paying for this account. I don't want it. I'm calling to call Cablevision to say, please, just get rid of this, mostly because I don't want to pay for it anymore. They say, somehow it's been transferred out from under your name, which was improper. He's upset about that, but so be it. At this point, he doesn't have the ability to shut this off. And, you know, whether he should have picked up the phone and called his wife or gotten some sort of other technical solution, I suppose that devolves into the area of what is the right thing for a husband to do, but not a question of whether there is intent or consent as a matter of law under the Wiretap Act. His view was, I'm not going to deal with this anymore. I still need to know when my kids need to be picked up, whether it's my week or whether it's her week to have the kids. And so, look, these were all issues that were hotly debated. I think were really two very stark different views of what the facts were. And then if we move on to what really is sort of counsel's argument, which are two legal points that he never made below, and he never even argued to the jury. The first point is that somehow this intersection between the integration clause and the merger clause of the marital separation agreement had an effect as a matter of law and consent under the Wiretap Act. He never even argued that as a factual matter to the jury. That wasn't his theory below. So if he's that upset with the trial court for not having, you know, realized sua sponte that he should have, you know, Judge Borsetti should have instructed, he at least could have gone to the jury and said, hey, look, here you have this agreement and that should have stopped it. But that wasn't his argument. The argument was there was no consent at the outset, and they had some other arguments, but that was really it. And on the verdict sheet, I think the record speaks for itself. We submitted a clear verdict sheet. There is no chance in the world that this jury did not understand from the arguments and from the instructions who had the burden of proof on consent. So unless there are any further questions. There was no question on the verdict sheet with regard to consent. That's right. That was embodied, I think, quite clearly. The judge one or two times said the burden is on me, my client, and twice Mr. Burke argued to the jury, you know, make sure the burden is on him. Question one was really meant to facilitate. Is there a liability here? Because then there were different ways to go in terms of the date cut off because of the agreement. There was a use and disclosure issue. But we're trying to say, very first question, is there a liability? If no, go home. If yes, let's break this down. You know, we had, I think, four or five or six or seven questions as opposed to the flow chart. But it was a simple way of allowing the jury to work through its decision-making process. Thank you. Thank you. Good morning. I'm pleased to call. My name is Larry Carlin. I've appeared pro se in this matter. I, of course, adopt Mr. Marmer's argument. I believe Plaintiff's Counsel acknowledges that if there's no liability on Dr. Abadir's part, then there can't be any liability on my part. I am willing to, unless the panel has questions, I'm willing to rely on my brief rather than argue. Thank you. Thank you. Mr. Burke? There's two points that I'd like to respond to with respect to Mr. Marmer's comments. The first was awareness of the auto-forwarding rule. Assuming that she was aware that the auto-forwarding rule was in place after they were divorced, that does not necessarily mean that there was consent. Our issue with respect to consent is that when the parties divorced, it was a game-changer. It changed. And if she had awareness, either by virtue of the bounce-back messages or through other means, that goes to the issue of the statute of limitations in terms of when the time is ripe for her to file her case. And in this particular situation, there clearly was a subset of interceptions that was not bound by the statute of limitations. And those would be the interceptions that occurred between December 3rd of 2008 and the date she filed the complaint, which was December 3rd of 2010. Statute of limitations did not apply to those claims. So the only defenses that we would have been bound by would have been the issue of consent, again, post-judgment or post-divorce, and the issue of intention, which we've spoken to. The second issue I want to raise, and that is the scope of consent. None of those issues are decidable as a matter of law, right? Pardon? They all went to the jury. Those did go to the jury. That's correct. The issue of scope of consent. Now, Dr. Rabideur testified at trial that the scope of consent was given so that he could obtain the records or the activity schedules of the children. Clearly, the manner by which he did the interception here hauled in everything. This was like a trawler going through the ocean in terms of the information that it pulled in. And the information that he ultimately retained and used later on was totally unrelated to the activities of the children. So with those two points, we'll rest. Thank you. Thank you. Thank you, Mr. Burke. Thank you, all three of you. We'll reserve decision. And that being the final case on for argument, I'll ask the clerk please to adjourn court.